UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 MAY 13 PM 2: 25

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| JESSICA GINGRAS and ANGELA C. GIVEN, on behalf of themselves and all others similarly situated,<br>   Plaintiffs<br><br>v.<br><br>JOEL ROSETTE, TED WHITFORD, and TIM McINERNEY<br>   Defendants | Docket No. 1:15-CV-101<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Nature of Action

1. This is a class action for equitable relief against a payday lender that has taken advantage of people who are struggling financially by charging extortionate interest rates and engaging in illegal lending practices.

2. Plain Green, LLC ("Plain Green") purports to be a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation." (https://www.plaingreenloans.com). The officers and directors of Plain Green are sued in their official capacity for equitable relief. *See Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014).

3. Plain Green was created after existing payday lenders approached the Chippewa Cree Tribe of the Rocky Boy's Reservation (the "Tribe") and requested that the Tribe become involved in a payday lending scheme. In the United States, stringent laws have been enacted to

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

prescribe how loans can be made and to prevent lenders from preying on indigent people. By involving the Tribe in the payday lending scheme, the lenders hoped to circumvent these laws and take advantage of legal doctrines, such as tribal immunity, to avoid liability for their actions. After its creation, Plain Green engaged in and continues to engage in a series of predatory loan practices that violate the law and that have injured numerous people who are struggling financially.

Parties

4. Jessica Gingras is a citizen of Vermont who took out payday loans from Defendants.

5. Angela Given is a citizen of Vermont who took out payday loans from Defendants.

6. Defendant Joel Rosette is the Chief Executive Officer of Plain Green and is sued in his official capacity. Rosette is responsible for all operations of Plain Green. Rosette is a citizen of Montana.

7. Defendant Ted Whitford is a member of Plain Green's Board of Directors and is sued in his official capacity. Whitford is a citizen of Montana.

8. Defendant Tim McInerney is a member of Plain Green's Board of Directors and is sued in his official capacity. McInerney is a citizen of Montana.

Jurisdiction and Venue

9. This suit alleges violations of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a) and 5536(a), and the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act.") This Court has federal question jurisdiction under 28 U.S.C. §



gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

1331. The Court also has jurisdiction because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1).

10. In addition, this Court has diversity jurisdiction because diversity of citizenship exists between Plaintiffs and Defendants and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Plain Green paid approximately $13 million to a loan servicer that participated in its payday loan scheme. These payments demonstrate that the amount of the payday loans is in excess of $13 million.

11. Additionally, this Court also has jurisdiction under the Class Action Fairness Act. 28 U.S.C. § 1332.

12. This Court may enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2202.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

## Factual Background

14. Payday lending takes advantage of people's need for cash. While marketed as a short term loan for emergency cash, the loans are usually not short term at all. A typical borrower cannot repay the entire amount of the loan right away. Instead, to avoid default, the borrower will often roll the loan over into another loan or take out a loan from an alternative lender. As interest continues to accrue on these loans, borrowers get stuck in a vicious debt trap from which they cannot escape. More of the borrowers' limited resources are diverted to interest on the payday loans, and borrowers struggle to meet their basic needs, such as food, shelter, and medical care.


gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 3 -

15. A typical payday loan has an extortionate interest rate of 200% or more. This type of loan causes people who are struggling financially to pay more in interest within one year than they originally borrowed in principal.

16. Payday lenders justify these exceptionally high interest rates by pointing to the allegedly short term nature of the loans and the supposedly higher risk profile of poor borrowers.

17. Payday lenders, like Plain Green, do not examine the borrower's ability to repay the loan in a short period of time.

18. In addition, payday lenders, such as Plain Green, create a repayment plan that is designed to extend the repayment period so that the lender can obtain substantial amounts from the high interest payments.

19. The risk to payday lenders, like Plain Green, has been exaggerated because payday lenders take advantage of a variety of techniques to insure they are repaid.

20. For example, Plain Green creates financial arrangements so that it has automatic access to a borrower's bank account and can withdraw money without further action from the borrower. Defendants require that borrowers agree to Automatic Clearing House ("ACH") withdrawals from their accounts before extending credit. This financial arrangement substantially reduces the risk of non-payment.

21. Plain Green also lends to people who have established periodic payments that are deposited into bank accounts, such as social security, disability, and veterans' benefits. After Plain Green has access to a borrowers' bank account, it can simply remove these deposits from the account and insure that it is paid.



22. Defendants use various contractual provisions to keep these usurious practices from review. These contract provisions include phony choice of law provisions and provisions claiming tribal immunity. These contractual provisions are unconscionable and unenforceable.

23. In some cases, Defendants have blocked borrowers' access to their Plain Green accounts so that the borrowers cannot determine what they have paid. In these cases, Defendants have refused to allow the borrowers to have access to the documents that purportedly create a binding contractual relationship between the borrowers and Plain Green.

24. Defendants also misrepresent that their loans are only intended to be short term loans. For example, Defendants state that "Plain Green loans are designed to help you meet your emergency borrowing needs." Contrary to these representations, the loan repayment schedule is not designed to be a short term loan.

25. Defendants also misrepresent that their loans are legitimate loans by reporting loan information to credit rating agencies. When certain borrowers fail to make payments, even on illegal loans, Defendants report the failure to make a payment as if it were a failure to make a payment on a legitimate loan.

## Jessica Gingras's Payday Loans From Plain Green

26. Jessica Gingras has taken out a number of payday loans, but has an incomplete record of those loans.

27. Defendants have blocked Jessica Gingras's access to her Plain Green account. As a result, the following descriptions are based on her reconstruction of the loans from other information that is available to her.

28. Jessica Gingras took out a payday loan from FBDLoans.com on March 16, 2000 in the amount of $1,200. She made a total of 30 payments. The payments were $97.09, except

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 5 -

that the last payment was $137.15. She paid a total of $2,952.76. FBDLoans.com transferred her loan to ThinkCash. ThinkCash transferred her loan again to Plain Green. The relationship between these entities is described below.

29. Jessica Gingras took out a payday loan from Plain Green on July 6, 2011 for $1,050. She made a total of 13 payments in the amount of $110.31. She paid a total of $1,434.03.

30. Jessica Gingras took out a payday loan from Plain Green on July 24, 2012 for $500. She made two payments for $92.25 before she took out an additional loan for $2,400. She then made payments in the amount of $131.90. She paid a total of $4,801.

31. Plain Green required Jessica Gingras to agree to ACH withdrawals from her bank account before it would give her a loan. Plain Green had automatic access to her bank account and continued to withdraw money from her account even after it had recouped the principal and a reasonable amount of interest.

32. Jessica Gingras has never been to Rocky Boy's Reservation. She applied for the loans at her residence in Vermont. The money was wired into her account in Vermont. ACH withdrawals occurred from her account in Vermont.

33. None of Plain Green's loan activity actually occurs on the Rocky Boy's Reservation. Plain Green uses third parties to carry out all the administrative tasks. The third party performs all of these tasks off of the reservation.

34. On information and belief, Defendants have extended similar loans to thousands of people.



gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 6 -

### Angela Given's Payday Loans From Plain Green

35. Angela Given has taken out a number of payday loans from Defendants. Because Defendants have blocked access to her Plain Green account, the following descriptions are based on her reconstruction of the loans from other information that is available to her.

36. Angela Given took out a payday loan on July 19, 2011 for $1,250. She made payments every two weeks for 26 weeks. She paid off the loan on July 19, 2012 with a final payment of $197.67. She paid a total of $2,968.75.

37. Angela Given took out a payday loan on July 24, 2012 for $2,000. The payments were $138.12 every two weeks. She made 14 payments and paid one lump sum in the amount of $1,801.73 on July 20, 2013. She paid a total of $3,735.41.

38. Angela Given took out a payday loan on May 20, 2013 for $250. The payments were $56.43 every two weeks. She made three payments of $56.43. She paid off the loan with a lump sum payment of $203.50. She paid a total of $372.34.

39. Angela Given took out a payday loan on July 17, 2013 for $3,000. The payments were $119.68. She made 25 payments. With the 15th payment, she included an extra $600 toward the principal. She still had five payments remaining when she called Plain Green and they cancelled her loan.

40. Angela Given has taken out other loans from Defendants and their predecessors in interest. On information and belief, a predecessor entity gave Angela Given's borrowing history and contact information to Plain Green for the purpose of evading the law.

41. Plain Green required Angela Given to agree to ACH withdrawals from her bank account before it would give her a loan. Plain Green had automatic access to her bank account

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 7 -

and continued to withdraw money from her account even after it had recouped the principal and a reasonable amount of interest.

42. Angela Given has never been to Rocky Boy's Reservation. She applied for the loans at her residence in Vermont. The money was wired into her account in Vermont. ACH withdrawals occurred from her account in Vermont.

## Class Allegations

43. Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of all members of the following Class:

All persons who took out payday loans from Defendants.

44. Plaintiffs do not know the exact number of class members because such information is in the exclusive control of Defendants. Based on information and belief and information obtained from publicly available sources, Plaintiffs believe that there are thousands of members of the Class as a whole. The exact number of class members and their identities is known or may be ascertained by Defendants.

45. The Class is so numerous that joinder of all members is impracticable.

46. There are questions of law and fact common to the Class, including:

    a. Whether Defendants have a practice of investigating a borrower's ability to repay a loan before extending credit;

    b. Whether Defendants set the periodic repayment amounts to maximize collection of interest on loans;

    c. Whether Defendants' rate of interest violates the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]";


gravel &
shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

  d. Whether Defendants' other payday lending practices violated the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]";

  e. Whether Defendants are liable to Plaintiffs and other class members for disgorgement or other equitable remedies and, if so, in what amount; and

  f. Whether Defendants are liable to Plaintiffs and other class members for reasonable attorney's fees.

47. Plaintiffs are members of the Class. Their claims are typical of the claims of the Class, and they will fairly and adequately protect the interests of the Class.

48. Plaintiffs are represented by counsel who is competent and experienced in handling *Ex Parte Young* cases, financial actions and class action litigation.

49. The prosecution of separate actions by individual members of the Class would create a risk that adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of the other members who are not parties to the individual adjudications, or it would substantially impair or impede the class members' ability to protect their interests.

50. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

51. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution of class member claims as a class action will eliminate the possibility of repetitious litigation. Treatment of the controversy as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently,



gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 9 -

and without the duplication of effort and expense that numerous individual actions would entail. This class action presents no difficulties in management that would preclude maintenance as a class action.

### Defendants' Efforts To Avoid Liability

52. Defendants have gone to great lengths to avoid any responsibility for their actions and have created structures to try to prevent the proper application of law.

53. The allegations in paragraphs 50 to 57 are drawn from a Complaint filed by the Pennsylvania Attorney General in the case of *Pennsylvania v. ThinkFinance, Inc. et al.*, (Court of Common Pleas, 1st Dist of Philadelphia.). The allegations in these paragraphs are made on information and belief.

54. Plain Green's very existence is an effort to avoid liability. Plain Green's predecessors in interest were not tribal entities. ThinkCash, Inc. (n/k/a Think Finance, Inc.) is a Delaware corporation. ThinkCash was formed in or around 2001 as a payday lender that operated over the Internet.

55. To avoid state limits on interest rates, ThinkCash used a lending model known in the money lending industry as "rent-a-bank." Payday lenders that were prohibited by state laws from making extortionate loans partnered with a bank so that the bank was the nominal lender. At the same time, the payday lender would market, fund, and collect the loan. The payday lender also performed other lending functions. Because the banks were insulated from state laws by federal bank preemption, the payday lenders were able to use the rent-a-bank scheme to avoid state laws.

56. During this time, First Bank of Delaware ("FBD") developed a specialty in providing banking services to payday lenders. FBD developed a relationship with ThinkCash



gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

that enabled ThinkCash to offer high interest rate loans and represent itself as "ThinkCash by First Bank of Delaware."

57. ThinkCash and FBD continued this relationship despite enforcement and regulatory efforts to stop the activity. The FDIC instituted an enforcement action in 2008 that culminated in a consent order. At the same time, ThinkCash developed plans for another law avoidance scheme called "rent-a-tribe."

58. FBD is no longer in business. In 2012, its shareholders voted to dissolve the bank. Soon thereafter, the United States Department of Justice announced a $15 million civil penalty to be paid by FBD.

59. The concept behind the "rent-a-tribe" scheme is to take advantage of tribal immunity in the same way that ThinkCash attempted to take advantage of federal bank preemption. Under the scheme, the loans were made in the name of a lender affiliated with the tribe, but ThinkCash provided the marketing, funding, underwriting, and collection of the loans.

60. Using the "rent-a-tribe scheme," ThinkCash exploited its customer base to generate future loans. The first rent-a-tribe scheme that ThinkCash started was the Plain Green enterprise. ThinkCash transferred the existing ThinkCash loans and the ThinkCash customer database to Plain Green. In addition, ThinkCash designed the web platform used by Plain Green so that existing ThinkCash customers visiting the ThinkCash website would be routed automatically to the Plain Green website.

### Arbitration Agreement

61. Another device that Defendants have employed to try to avoid legal liability is a purported arbitration agreement. To be clear, none of the Plaintiffs in this action can access any


gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 11 -

of the records relating to their loans from Plain Green, including any purported arbitration agreement with Defendants.

62. Nevertheless, documents filed in other actions by Plain Green include an arbitration agreement, which Plaintiffs anticipate Defendants will assert as a defense to this action.

63. That arbitration agreement is unenforceable because it is both unconscionable and its purpose has been frustrated.

64. The agreement does not waive and attempts to preserve tribal immunity. Thus, the agreement purports to give Defendants the ability to void any arbitration award by simply asserting tribal immunity after the fact. Thus, the arbitration agreement provides a remedy that is entirely illusory.

65. For this reason alone, the agreement is unconscionable. There are several additional indications that the agreement is unconscionable, including the following:

    a. Because the monetary damages suffered by each Plaintiff and other members of the Class is small, the individual incentive to bring an action is extremely limited, particularly since payday loans target people who have few resources to bring a claim.

    b. The doctrine of tribal immunity is a complicated legal doctrine with which the vulnerable people in this Class are unfamiliar.

    c. The terms of the purported contract are not easily discovered on the Plain Green website. The terms of the agreement change from when a person applies for the loan to when the terms are presented after the application



- 12 -

    process. The terms are presented on a take it or leave it basis with no possibility of negotiation.

  d. The parties also have a great imbalance in negotiating leverage. Defendants have highly paid attorneys from Pepper Hamilton LLP and Hogan Lovells US LLP representing them in litigation. Plaintiffs lack the resources to hire such esteemed counsel.

  e. When there is a hint of litigation, Plain Green cuts off access to the borrower's account, so that the borrower can no longer access the documents that purport to structure the relationship with Plain Green.

  f. The arbitration agreement has a provision for shifting costs. That provision discourages borrowers from filing low dollar claims.

  g. Defendants will only agree to have arbitration where the borrower resides if the borrower reaffirms that tribal immunity applies.

66. The intent of the arbitration agreement for a swift resolution will be frustrated by a dispute about who is the appropriate chief judge of the Tribe. The arbitration agreement states that Arbitration procedures are simpler and more limited than court procedures. The arbitration agreement requires that certain matters be resolved by tribal courts. Due to the corruption described below, there is no guarantee that Plaintiffs will receive a fair, complete, simple, or final resolution from the tribal courts.

### Governance of The Tribe and Plain Green

67. The governance of the Tribe and Plain Green is in substantial flux and turmoil. Widespread corruption has gripped the Tribe. There is a large federal investigation into bribery


gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

at the Tribe. Several former tribal officials have been convicted of, or pled guilty to, embezzlement and bribery.

68. John Chance Houle (former chairmen of Plain Green), Tony James Belcourt, Tammy Kay Leischner, James Howard Eastlick, Mark Craig Leischner, and Haily Lee Belcourt were indicted in a 17 count indictment on April 18, 2013. The indictment relates to the spending of federal funds from the stimulus bill or the American Recovery and Reinvestment Act of 2009 ("ARRA"). At the time, Houle was also a member of the Chippewa Cree Business Committee, which purportedly runs the Tribe.

69. In connection with that case, Tony James Belacourt, as an agent of the tribal government (CEO of the Chippewa Cree Construction Company), pled guilty to embezzlement of federal funds, Tammy Kay Leischner pled guilty to theft from an Indian Tribal Government receiving federal funds, and James Howard Easterlick pled guilty to the same offense.

70. In a separate case, John Chance Houle pled guilty to embezzling funds from the Chippewa Cree Rodeo Association. In yet another case, John Chance Houle pled guilty to theft from an Indian tribal organization and obstruction of justice and impeding a grand jury investigation related to embezzlement and kickback schemes involving the ARRA and Chippewa Cree Rodeo Association funds. In a third case, John Chance Houle pled guilty to income tax evasion related to the illegal money that he received from his various embezzlement and bribery schemes.

71. The federal investigation is continuing.

72. The corruption extends to Plain Green. In an arbitration involving Plain Green, an arbitrator found that its former Chief Executive Officer, Neal Rosette, and its former Chief Operating Officer, Billi Anne Morsette were involved in a fraudulent kick-back scheme with an



entity called Encore Services, LLC ("Encore"). Encore manages payday lending business for the Tribe.

73. In the scheme, Encore charged a 15% management fee of all gross revenues of the tribal online lending business, but immediately sent 5% of those revenues to Rosette and Morsette. The purpose of the structure was to conceal the payments to Rosette or Morsette.

74. It is also uncertain who is actually the head of the Tribe and the Tribal Judiciary. Ken Blatt-St. Marks who was elected Chairman has been dismissed by the Business Committee. Before he was removed, Blatt-St. Marks fired the acting Chief Judge Micelle Ereaux and unilaterally appointed Duane Gopher. In addition, Blatt-St. Marks also apparently terminated several other judges of the Tribal Courts.

75. Based on the actions with respect to the Chief Judge and other serious charges of embezzlement, the Business Committee removed Blatt-St. Marks on March 2, 2015.

76. The Tribe has apparently tried to remove Blatt-St. Marks in the past. In March 2013, the Business Committee fired him, but the Interior Department said that the Tribe had to reinstate him because he was protected by federal whistleblower laws.

77. The question of who is actually running the Tribe and its judicial system is very much in flux and not likely to be resolved in the near future.

## COUNT ONE
### Consumer Financial Protection Act of 2010

78. Plaintiffs reassert and incorporate by reference each of the above paragraphs.

79. Defendants' extension of credit under the terms provided without examining the ability to repay is a violation of the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]."


gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

80. The exorbitant interest rates charged by Defendants combined with automatic access to and deduction from a consumer's bank account are a violation of the CFPA's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]."

81. Defendants have falsely reported the status of consumer's illegal debts to credit rating agencies as if they were legitimate debts.

82. Defendants' representation of the loans as short term emergency loans is deceptive and false.

83. Defendants' representation of the loans as legitimate loans to credit rating agencies is deceptive.

84. Defendants' violations of the CPFA are ongoing.

85. As a result of Defendants' violations of the CFPA, Plaintiffs were damaged.

## COUNT TWO
### Federal Trade Commission Act

86. Plaintiffs reassert and incorporate by reference each of the above paragraphs.

87. The FTC Act bars the use of "unfair methods of competition."

88. Defendants' extension of credit under the terms provided without examining the ability of borrowers to repay is a violation of the FTC Act's prohibition on unfair methods of competition.

89. The exorbitant interest rates charged by Defendants combined with automatic access to a consumer's bank account are a violation of the FTC Act's prohibition on unfair methods of competition.

90. Defendants' representation of the loans as short term emergency loans is deceptive and an unfair method of competition.



76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

91. Defendants' representation of the loans as legitimate loans to credit rating agencies is deceptive and an unfair method of competition.

92. Defendants' violations of the FTC Act are ongoing.

93. As a result of Defendants' violations of the FTC Act, Plaintiffs were damaged.

## COUNT THREE
### Electronic Funds Transfer Act

94. Plaintiffs reassert and incorporate by reference each of the above paragraphs.

95. Defendants are "persons" as this term is defined in Section 1005.2(j) of Regulation E, 12 C.F.R. § 1005.2(j).

96. Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

97. Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "[n]o financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

98. The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R § 1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by electronic means on a preauthorized recurring basis.

99. Under Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of EFTA and Regulation E constitutes a violation of the FTC Act.



76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION


100. In numerous instances, in connection with offering payday loans to consumers, Defendants have conditioned the extension of credit on recurring preauthorized electronic fund transfers, thereby violating Section 913(1) of EFTA, 15 U.S.C. § 1693k(1), and Section 1005.10(e)(1) of Regulation E, 12 C.F.R § 1005.10(e)(1).

101. Defendants' violations of the EFTA are ongoing.

102. By engaging in the violations of EFTA and Regulation E set forth in this Complaint, Defendants have violated the FTC Act.

103. As a result of Defendants' violations of the EFTA, Plaintiffs were damaged.

## COUNT FOUR
## Vermont Consumer Fraud Act

104. Plaintiffs reassert and incorporate by reference each of the above paragraphs.

105. Under section 2481w of the Consumer Fraud Act, "it is an unfair and deceptive act and practice in commerce" for any lender to make a loan to a consumer unless that lender is in compliance with all provisions of 8 V.S.A. Chapter 73 (Licensed Lenders laws). In relevant part, 8 V.S.A. § 2201 requires that all lenders obtain a license from the Vermont Department of Financial Regulation before loaning any money in Vermont. Any unlicensed lender providing payday loans to Vermont consumers is in violation of the CFA.

106. Defendants are not licensed lenders in Vermont.

107. It is a violation of the CFA to charge interest in excess of the legal rates set under 9 V.S.A. § 41a (generally 18-21% for the type of loan at issue here). *See* Consumer Protection Rule 104.05 (making any collection or attempt to collect interest in excess of the legally chargeable rate an unfair and deceptive act under section 2453(a) of the CPA).

108. Defendants' violations of the Vermont Consumer Fraud Act are ongoing.



- 18 -

109.  Defendants charge interest in excess of the statutory maximum.

110.  Defendants' lending practices also violate the CFA's bar on deceptive and unfair business practices.

Claims for Relief

WHEREFORE, Plaintiffs respectfully seek the following relief:

A.  A declaration that Defendants have violated the Consumer Financial Protection Act of 2010;

B.  A declaration that Defendants have violated the Federal Trade Commission Act;

C.  A declaration that Defendants have violated the Vermont Consumer Fraud Act;

D.  A declaration that Defendants have violated the Electronic Funds Transfer Act;

E.  A permanent injunction barring Defendants from providing, collecting on, and servicing illegal loans;

F.  A permanent injunction barring Defendants from conditioning loans on agreeing to ACH withdrawals;

G.  Preliminary and temporary injunctive relief as the Court deems appropriate;

H.  Equitable surcharge seeking return of all interest charged above a reasonable rate and any financial charges associated with the loan;

I.  An order awarding attorneys' fees and costs; and

J.  Any other relief the Court deems just and proper.


gravel &
shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 19 -

## JURY DEMAND

**Plaintiffs demand trial by jury of all issues so triable.**

Dated:   Burlington, Vermont
         May 13, 2015

_____
Matthew B. Byrne, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P. O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
mbyrne@gravelshea.com
For Plaintiff


gravel & shea ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

&lt;1009858v3/MBB&gt;

- 20 -